IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| BARBARA GAIL SMITH, | ) | Case No. 10-06841-TOM-13 |
| | ) | |
| Debtor. | ) | |

| | | |
|---|---|---|
| BARBARA GAIL SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | A.P. No. 11-00226-TOM |
| vs. | ) | |
| | ) | |
| WELLS FARGO FINANCIAL | ) | |
| ALABAMA, INC. | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

This adversary proceeding came before the Court on July 23, 2012, for trial on the Complaint filed by Barbara Gail Smith, and the Objection to Claim 3 of Wells Fargo filed by Barbara Gail Smith. Appearing before the Court were Debtor/Plaintiff Barbara Gail Smith ("Smith"); Kenneth J. Lay, counsel for Smith; and David Sicay-Perrow, counsel Defendant Wells Fargo Financial, Alabama, Inc. ("Wells Fargo").[1] This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 151, and 157(a) and the District Court's General Order Of Reference Dated July 16, 1984, As Amended

---

[1] In addition to Wells Fargo, Smith's Complaint named Norwest Financial Alabama, Inc., Dianne Marshall, T. Davidson, and Russ Osburn as defendants. An Answer to Complaint was filed on behalf of both Wells Fargo and Norwest Financial Alabama, Inc. No appearances were ever filed on behalf of the other three defendants, and at trial no references were made to them in their capacity as defendants. Russ Ogburn, erroneously referred to as Russ Osburn in the Complaint, testified at trial as a rebuttal witness on behalf of Wells Fargo.

July 17, 1984.[2] This is a core proceeding arising under Title 11 of the United States Code as defined in 28 U.S.C. § 157(b)(2)(B) and (K).[3] This Court has considered the pleadings, arguments, evidence, testimony, and the law, and finds and concludes as follows.[4]

## FINDINGS OF FACT[5]

At the trial on her Complaint and objection to claim, Smith testified that in 1971 she purchased her home on Powell Street in Birmingham for $19,000 and has lived there continuously since that time. According to her testimony, the original purchase was financed by Collateral Investment Company, and around 1996 or 1997 she obtained a loan from Phoenix Financial Service, Inc. ("Phoenix Financial"), which was later transferred to Litchfield Financial Corporation

---

[2] The General Order of Reference Dated July 16, 1984, As Amended July 17, 1984 issued by the United States District Court for the Northern District of Alabama provides:

> The general order of reference entered July 16, 1984 is hereby amended to add that there be hereby referred to the Bankruptcy Judges for this district all cases, and matters and proceedings in cases, under the Bankruptcy Act.

[3] 28 U.S.C. §157(b)(2)(B) and (K) provide as follows:

(b)(2)Core proceedings include, but are not limited to–
(B) allowance or disallowance of claims against the estate . . . ;
 . . .
(K) determinations of the validity, extent, or priority of liens[.]

[4] This Memorandum Opinion constitutes findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, applicable to adversary proceedings in bankruptcy pursuant to Federal Rule of Bankruptcy Procedure 7052.

[5] Pursuant to Rule 201 of the Federal Rules of Evidence, the Court may take judicial notice of the contents of its own files. *See ITT Rayonier, Inc. v. U.S.*, 651 F.2d 343 (5th Cir. Unit B July 1981); *Florida v. Charley Toppino & Sons, Inc.*, 514 F.2d 700, 704 (5th Cir. 1975).

Case 10-06841-TOM13    Doc 88    Filed 09/12/12    Entered 09/12/12 13:57:11    Desc Main
Document      Page 2 of 19

("Litchfield").[6] Smith's testimony with regard to the dollar amount of this transaction is conflicting. At first Smith testified that she obtained a $15,000 loan from Phoenix Financial, the proceeds of which were used for home repairs and to pay off the approximately $5,600 balance remaining on the purchase money loan from Collateral Investment. Later, Smith testified that from the proceeds approximately $15,000 was used to make repairs on the home and approximately $5,600[7] was used to pay off the loan from Collateral Investment. Smith further testified that she did not give a mortgage to Phoenix Financial because the loan transaction was a "consolidation."

Smith testified that in June 1998 she obtained a loan from Wells Fargo[8] in the approximate amount of $57,000. The proceeds were used to pay the Phoenix Financial/Litchfield balance of $21,667.00, to pay off a University Credit Union vehicle loan in the amount of $12,814.00,[9] and the balance used to consolidate other bills. Smith's testimony is contradictory to the June 25, 1998 Note

---

[6] At trial Wells Fargo introduced into evidence a Title Certificate prepared by Newman Law Firm, P.C. listing the mortgages and other voluntary encumbrances of public record on Smith's property since August 9, 1971. Included in the list is a mortgage from Barbara G. Smith a/k/a Barbara S. Cray to Phoenix Financial Service, Inc. dated February 25, 1997, in the amount of $21,803.70. The mortgage was later transferred and assigned to Litchfield Financial Corporation. See Wells Fargo's Exhibit 4.

[7] The later testimony is more consistent with the recorded Phoenix Financial mortgage in the amount of $21,803.70.

[8] At trial Smith made clear that she never obtained a loan from Wells Fargo but from Norwest Financial. Wells Fargo introduced into evidence an Articles of Amendment to Articles of Incorporation evidencing Norwest Financial Alabama, Inc.'s name change to Wells Fargo Financial Alabama, Inc. effective at the close of business on June 30, 2000. See Wells Fargo's Exhibit 5. For the sake of clarity the lender will be referred to as "Wells Fargo" for the remainder of this Opinion.

[9] See FN 12.

(the "June Note") itself.[10] According to the June Note Smith borrowed $53,353.47 (the "Amount Financed"); the June Note includes a financial disclosure that indicates $57,238.53 is the amount Smith would have paid over and above the principal amount had the loan been repaid pursuant to its terms (the "Finance Charge").[11] The June Note further indicates that $6,973.29 was given to Smith directly out of the loan proceeds. Smith denied having received those funds.

Smith denied having signed, or having ever seen, the Alabama Real Estate Mortgage dated June 25, 1998 ("June Mortgage")[12] giving Wells Fargo a security interest in real property located at 102 Powell Avenue South purportedly securing the "indebtedness on [the] promissory note of even date . . . ." The June Mortgage identifies "Barbara G. Smith AKA Barbara C. Cray" as the borrower and bears the signature "Barbara G. Smith AKA Barbara C. Cray." According to Smith's testimony, she has been known as "Barbara Gail Cray" and "Barbara S. Cray" but she has never used the name "Barbara C. Cray."

Smith testified that shortly after the June 25, 1998 transaction she again obtained a loan from Wells Fargo to consolidate bills. According to the Note dated August 21, 1998 (the "August Note")[13] Smith financed $70,522.57 at 13.02% "Annual Percentage Rate"/12.09% "Rate of Interest Per Year." These funds were used to pay off the prior Wells Fargo loan in the amount of $50,932.40,

---

[10] The June 1998 Note was not introduced by either side as a trial exhibit. The Note was attached to both the original proof of claim and the amended proof of claim filed by Wells Fargo, and the Court takes judicial notice of the same.

[11] According to the June Note Smith would have paid a total of $110,592.00 (Amount Financed plus Finance Charge) had she paid on schedule.

[12] The June Mortgage was introduced into evidence as part of Wells Fargo's Exhibit 4.

[13] The August Note was introduced into evidence as Wells Fargo's Exhibit 2.

4

and to pay off a debt to Jim Burke Motors, Inc. for a vehicle in the amount of $14,784.87.[14] Although the August Note reflects Smith financed $70,522.57, it also reflects a prepaid finance charge of $3,526.10 bringing the actual principal balance on the date of the loan to $74,048.67. The August Note and financial disclosures further reflect that if Smith paid the Note according to its terms she would pay $86,691.33 in interest over and above the amount she actually borrowed. Thus, if Smith had paid the loan in full and in compliance with the terms of the August Note she would have paid a total of $160,740.00 during the repayment period.

However, Smith did not pay strictly in accordance with the August Note. At trial Wells Fargo introduced into evidence a payment history[15] itemizing all payments, late charges, and other loan activity since the date of the loan. According to the payment history Smith paid some payments late and missed some payments altogether. Some payments were returned by her bank for insufficient funds. As a result, additional interest continued to accrue along with late fees and NSF fees. Sometimes the additional interest and charges went unpaid by Smith and would be collected from subsequent monthly payments. Because of the additional interest and fees Smith would have

---

[14] Smith's testimony regarding the car loans paid off with the June 1998 and August 1998 Wells Fargo loans was confusing and contradictory. At first Smith testified that the payment to University Credit Union listed on the June 25, 1998 Note was payment for a Cadillac Sedan Deville, and that the payment to Jim Burke Motors, Inc. listed on the August 21, 1998 Note was for a Dodge Intrepid. However, a "Buyer's Order" dated August 18, 1998, which is part of Wells Fargo's Exhibit 8, shows that Smith purchased a 1996 Cadillac Deville from Jim Burke, trading in a 1995 Dodge Intrepid. Smith later testified that Jim Burke had given her credit on the Deville for payments she made on the Intrepid, leaving a balance of $12,000. However, the Buyer's Order dated August 18, 1998 indicates Smith had been given no trade-in allowance for the Intrepid, leaving a balance due of $13,504.87. In answer to this Court's question of how the $13,504.87 had been paid off Smith testified that it had been paid out of the $57,000 loan. At some point, Smith also testified that she went back to Jim Burke and purchased a Chrysler 300. She gave no further details as to that particular transaction.

[15] The Payment History was introduced into evidence as Wells Fargo's Exhibit 8.

had to pay even more than $160,740.00 to pay the loan in full over the term of the loan. However, the payment history shows Smith's payments only total approximately $100,000.00.

Smith did not dispute the amount of the August Note, but she again claimed she had never seen nor signed the Alabama Real Estate Mortgage dated August 21, 1998 ("August Mortgage")[16] purporting to secure the August Note. Like the June Mortgage, the August Mortgage identifies "Barbara G. Smith AKA Barbara C. Cray" as the borrower and bears the signature "Barbara G. Smith AKA Barbara C. Cray." Smith further testified that she did not know either Veronica Patterson, a witness to both the June and August Mortgages, or Russ Ogburn, notary for both Mortgages. Other than her own testimony, Smith presented no evidence that she did not sign either Mortgage.

Smith further testified that in 2009 when Belk department store, her employer of 20 years, made wage cuts across the board her hourly pay was reduced from $16.00 to $8.00. She further testified that her trouble making the loan payments began around this time. She stated she contacted Wells Fargo to inquire about President Obama's new stimulus program,[17] and eventually spoke with a Wells Fargo representative in Hawaii named Kate who advised her to stop making payments. According to Smith, after submitting her paperwork twice, she was informed by Kate that the government, not Wells Fargo, turned her down because she did not make enough money. She testified that she went to Legal Services for advice and was told she owed a balance of approximately

---

[16] The August Mortgage was also introduced into evidence as part of Wells Fargo's Exhibit 4.

[17] In 2009 Congress passed, and President Obama signed into law, the American Recovery and Reinvestment Act of 2009. *See* Recovery.gov, http://www.recovery.gov/About/Pages/The_Act.aspx (last visited Sept. 5, 2012).

6

$8,000 to $9,000. She claims she first discovered the existence of the June Mortgage and the August Mortgage when she attempted to do a reverse mortgage with Wells Fargo.

In addition to contesting the two Mortgages purportedly given by her to Wells Fargo, Smith contests the balance due on the loan. She asserts that around the time she contacted Wells Fargo for assistance she had only one year left to pay on her loan since the August Note would mature in 2010. However, again her testimony is questionable because, according to the disclosures on the August Note, the loan term was 180 months (15 years) with a maturity date of August 26, 2013. Nevertheless, as proof of the amount she owed, Smith introduced into evidence what she claimed were all of the bank statements and cancelled checks that she could find evidencing payments to Wells Fargo.[18] Counsel for Wells Fargo stated that its payment history gave Smith credit for a higher amount and/or more payments than the evidence provided by Smith.

Russ Ogburn, who testified as a rebuttal witness on behalf of Wells Fargo, worked as a Branch Manager at Wells Fargo (then known as Norwest Financial) in 1998. He testified that he did not personally prepare the loan documents purportedly signed by Smith, but he did act as the Notary on both the June and August Mortgages. Although he does not remember Smith specifically, he testified that he would not notarize a document without seeing the affiant sign it and without checking the affiant's driver license. No evidence or testimony was offered to contradict this testimony or to challenge this witness's credibility.

Smith filed this bankruptcy case on November 19, 2010. Wells Fargo filed its proof of claim in the amount of $48,016.70 on December 28, 2010, and amended its proof of claim to include as

---

[18] The bank statements and checks were introduced into evidence as Smith's Exhibits 9 and 16.

7

Case 10-06841-TOM13    Doc 88    Filed 09/12/12    Entered 09/12/12 13:57:11    Desc Main
Document    Page 7 of 19

an attachment the August Note on February 25, 2011. Smith filed this Adversary Proceeding against Wells Fargo on June 6, 2011.

## CONCLUSIONS OF LAW

### COUNT ONE - ACTION TO QUIET TITLE TO REAL PROPERTY

Smith asserts that she, as a chapter 13 debtor, has the powers of a chapter 13 Trustee found in section 544(a)(3), and pursuant to those powers, requests the Court to quiet title "in the name of the estate for the benefit of the creditors of the estate." Under section 544(a)(3), a chapter 13 Trustee assumes the status of a bona fide purchaser of real property from the debtor, and as such, may avoid any transfer of a debtor's property that would be avoidable by a bona fide purchaser. Certain powers of a chapter 13 Trustee are extended to a debtor pursuant to section 1303; however, a chapter 13 Trustee's power under section 544 is not one of them.[19] *Smith v. One West Bank,, FSB (In re Smith)*, 459 B.R. 571, 572 (Bankr. M.D. Pa. 2011); *Holcombe v. Debis Financial Services, Inc. (In re Holcombe)*, 284 B.R. 141, 145 (Bankr. N.D. Ala. 2001). Because Smith is not authorized by the Code to exercise the chapter 13 Trustee's powers under section 544, there is no need for this Court to further address the quiet-title claim.

### COUNT TWO - VIOLATION OF THE AUTOMATIC STAY

In the Complaint Smith alleges that Wells Fargo violated the automatic stay of section 362 by filing "false and fraudulent claims" in order to hinder the administration of the bankruptcy estate

---

[19] 11 U.S.C. § 1303 provides:

Subject to any limitations on a trustee under this chapter, the debtor shall have, exclusive of the trustee, the rights and powers of a trustee under sections 363(b), 363(d), 363(e), 363(f), and 363(l), of this title.

8

and receive more than its fair share of estate assets. Filing a proof of claim in itself is not a violation of the automatic stay; in fact, the Code provides not only that a secured creditor may file a proof of claim, but that if the creditor does not timely file a claim the debtor or someone also liable on the debt may do so. *See* section 501(a) - (c). Just because a debtor takes issue with the amount of a claim does not transform the filing of the claim into a stay violation. In *In re Sammon* the debtors argued that a proof of claim filed by the IRS violated the stay because the claim was excessive and did not give them credit for a large payment. *In re Sammon*, 253 B.R. 672 (Bankr. D.S.C. 2000). The bankruptcy court held that the IRS did not violate the stay because, first, the filing of a proof of claim and a debtor's opportunity to object to the claim are contemplated by the Bankruptcy Rules. *Id*. at 680. Second, the automatic stay does not apply to proceedings in the bankruptcy court in which the case is pending. *Id*. at 680 - 81. Third, the debtors did not prove that as a result of the IRS's actions they suffered damages which could not have been mitigated by them or their counsel. *Id*. at 681. *See also Turner v. American Express Centurion Bank (In re Turner)*, Adv. No. 11-1092, 2011 WL 4352158, at *2 - *3 (Bankr. E.D. Tenn. 2011) (noting that the filing of an inaccurate proof of claim does not violate the stay).

For the same reasons as those identified by the court in *Sammon*, there has been no stay violation in the case before this Court. Wells Fargo has exercised its right as a creditor to file a proof of claim and Smith has exercised her right as a debtor to object to the amount which she believes is incorrect. It would ironic for Wells Fargo to be punished for taking an action specifically authorized by the Code and Rules. Because the filing of a proof of claim, even an allegedly incorrect one, does

9

Case 10-06841-TOM13   Doc 88   Filed 09/12/12   Entered 09/12/12 13:57:11   Desc Main
Document      Page 9 of 19

not violate the automatic stay and Smith is not entitled to relief on this count.[20]

**COUNT THREE - FRAUD ON THE COURT**

Smith alleges in Count Three that Wells Fargo, in its attempt to obtain more than its share of the estate, has perpetrated fraud on the Court by filing false pleadings and concealing the "true mortgage creditor's identity," thereby deceiving the Court and interfering with the administration of the bankruptcy estate.

Fraud on the court encompasses "'only the most egregious misconduct, such as bribery of a judge or members of a jury, or the fabrication of evidence by a party in which an attorney is implicated . . . .'" *Patterson v. Lew*, 265 Fed.Appx. 767, 768 (11th Cir. 2008) (unreported) (*quoting Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1338 (5th Cir.1978)). "'Fraud upon the court' . . . embrace[s] only that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication.'" *Zakrzewski v. McDonough*, 490 F.3d 1264, 1267 (11th Cir. 2007) (*quoting Travelers Indem. Co. v. Gore*, 761 F.2d 1549, 1551 (11th Cir.1985)). Perhaps more important is what courts have concluded does not constitute fraud on the court. It has been recognized that fraud on the court does not include the unintentional misidentification of the mortgage holder on a motion for relief from stay where the mistake was isolated and did not result in prejudice to the estate. *Phillips v. Aurora Loan Services, LLC (In re Phillips)*, AP No. 11-00027, 2011 WL 6779553, at *3 (Bankr. S.D. Ala. Dec. 27, 2011). Also, fraud on the court does not include "'fraud between the parties or fraudulent documents, false

---

[20] In addition to asserting that Wells Fargo has filed an inflated claim Smith asserts that the mortgages attached to the proof of claim have been forged. The alleged forgery is addressed in the analysis of Smith's fraud claim (Count Five) later in this opinion.

10

statements or perjury.'" *United States v. Smiley*, 553 F.3d 1137, 1147 (8th Cir. 2009) (*quoting Bulloch v. United States*, 763 F.2d 1115, 1121 (10th Cir. 1985)).

Smith testified that she obtained the loan at issue from Norwest, not Wells Fargo. The proof of claim and amended proof of claim filed by Wells Fargo names "Wells Fargo Financial Alabama, Inc." as the creditor, but contains no explanation of how Wells Fargo is entitled to file a claim for the loan originally made by Norwest. Because of this Smith asserts that Wells Fargo has concealed the true creditor's identity. At trial Wells Fargo introduced into evidence as Wells Fargo's Exhibit 5 an Articles of Amendment to Articles of Incorporation evidencing Norwest Financial Alabama, Inc.'s name change to Wells Fargo Financial Alabama, Inc. Thus, Wells Fargo is not acting on behalf of some other entity whose identity has not been revealed, but is in fact the same entity that made the loan at issue. Perhaps any confusion as to the identify of the "true mortgage creditor" could have been avoided had Wells Fargo attached the Articles of Amendment to its proof of claim, but there is no evidence that the information was purposely omitted with a sinister motive. Furthermore, the omission, whether done by mistake or otherwise, has caused no prejudice to the estate.

Smith's claim of fraud on the court is also premised on the allegation that Wells Fargo has filed false pleadings, namely a proof of claim that she asserts is not only excessive but is supported by mortgages on which Smith's signatures have been forged. Even if Smith's allegation is true, false documents and statements do not support a finding of fraud on the court. There is no evidence that Wells Fargo's attorney has been involved in fabricating evidence. The Court's ability to carry out "its impartial task of adjudging cases" has not been hampered by the proof of claim. In fact, the Court's duty in this adversary proceeding is to determine whether or not Smith has proven that she

11

did not sign the Mortgages and to rule on the objection to claim. It would be more disruptive to the "judicial machinery" if the fear of committing fraud on the court prevented counsel from filing a document or presenting evidence about which there is a *legitimate* dispute.[21] Smith has not proven fraud on the court; thus relief on Count Three of the Complaint is due to be denied.

## COUNT FOUR - OBJECTION TO CLAIM

Smith's Complaint includes a count objecting to Wells Fargo's proof of claim on the grounds stated in the Objection to Claim filed in the main bankruptcy case (BK Doc. 44); namely, (i) that Smith owes less than the amount of the claim, (ii) that the documentation supporting the proof of claim is inconsistent; (iii) that Smith's purported signature on the mortgage is a forgery, and (iv) the Note does not identify any real property given as security and thus there is no valid security interest. Smith asks that the Court strike the proof of claim, preclude Wells Fargo from amending the claim or substituting a new claim, and cancel and discharge the underlying debt regardless of whether Smith receives a discharge in her bankruptcy case.[22]

A proof of claim is prima facie evidence of the amount due. Smith asserts that she owes less than the claim amount but has presented to the Court no credible or reliable evidence to back up her

---

[21] The Court is in no way condoning filing or presenting false, fraudulent, or inaccurate pleadings or other evidence.

[22] Count Four also requests sanctions against the creditor, as well as an award of attorneys fees, for intentionally revealing the debtor's private data and health information, and that "claim number 4" be disabled or removed from PACER records to prevent access of the claim by the general public. Interestingly, the Complaint contains no allegations that Wells Fargo, intentionally or otherwise, revealed Smith's private data and health information. It would be even more interesting if the Complaint did contain such allegations since Wells Fargo is a mortgage lender, not a health care provider. In addition, Wells Fargo filed claim number 3, not number 4. The Court will presume that these requests for relief were part of a form Complaint and were overlooked when Smith's counsel adapted the form to the facts of this adversary proceeding.

12

assertion. Copies of cancelled checks have been introduced into evidence but it appears from the loan history provided by Wells Fargo that Smith has been given credit for more payments and/or for a higher amount than the payments she introduced into evidence. Smith has provided no evidence of payments to Wells Fargo other than the cancelled checks and bank statements admitted into evidence as her Exhibits 9 and 16, and thus has not rebutted the presumption that the amount of debt stated on the proof of claim is correct. Furthermore, the payment history shows payments were made late, were missed, or were dishonored by her bank. All of this resulted in additional interest charges, late charges, and NSF charges added to the loan balance. To pay the loan in full Smith had to pay the monthly payments timely and pay more than $160,000 over the term of the loan. She has paid approximately $100,000; thus the Court must conclude that the payoff balance of approximately $41,000 as of 2010 appears accurate.

Smith further objects to Wells Fargo's claim on the grounds that the date and amount of the mortgage attached to the proof of claim do not match the date and amount of the note also attached to the proof of claim. As to Wells Fargo's original proof of claim Smith is correct. Wells Fargo attached the August Mortgage in the amount of $70,522.57 and the June Note in the amount of $53,353.47 to the original claim. Once Smith objected Wells Fargo amended the proof of claim to include the August Note in the amount of $70,522.57. Neither the Bankruptcy Code nor the Federal Rules of Bankruptcy Procedure set a deadline to amend a timely filed proof of claim. *In re Spurling*, 391 B.R. 783, 786 (Bankr. E.D. Tenn. 2008). Thus, this portion of the objection is no longer relevant.

Another basis for Smith's objection is that the attached note "does not identify any real property secured for the loan and therefore it appears that there is not a valid secured interest." It

13

is not necessary for a promissory note to identify any collateral securing the debt. In fact, a mortgage may be given to secure a pre-existing debt. Jesse P. Evans, III, *Alabama Property Rights and Remedies* § 34.1 (2010). The relevant question is whether the mortgage sufficiently describes the collateral.[23] *Id.* at § 4.3. The lack of a real property description on the promissory note is not a valid basis for objection. Smith has presented no evidence that the claim amount is overstated and thus has not rebutted the presumption of the correctness of the proof of claim on this ground.

Finally, Smith objects on the grounds that her purported signatures on both the June 1998 and August 1998 Mortgages have been forged. Even if Smith is correct in her assertion, it would not be a basis for cancelling the underlying debt, but could affect the secured status of the claim. The question again comes down to whether or not the signatures on the Mortgages have been forged.

**COUNT FIVE - FRAUD**

Smith alleges that Wells Fargo knowingly made "false and misleading misrepresentations ... by completing false mortgage documents, filing them with the probate court and notarizing her false signature," or that Wells Fargo recklessly or mistakenly misrepresented the facts with the intention that others viewing Smith's credit should rely on those representations. To establish fraud in Alabama:

> Regardless of whether a representation was made willfully, recklessly, or mistakenly, in order to obtain a judgment based on fraud, the plaintiff must prove: (1) that the defendant made a false representation; (2) that the false representation concerned a material existing fact; (3) that the plaintiff relied upon the false representation; and (4) that the plaintiff was damaged as a proximate result of his or her reliance upon the false representation.

---

[23] It should be noted that while neither the June Note nor the August Note contain a real property description, both do indicate (by way of a check box next to the words "Real Estate") that Smith is giving a security interest in real property.

14

*Hood v. Bennitt (In re Bennitt)*, 348 B.R. 820, 827 (Bankr. N.D. Ala. 2006) (Cohen, J.).[24] *See also Exxon Mobil Corp v. Ala. Dept. of Conservation and Natural Resources*, 986 So. 2d 1093 (Ala. 2007). The misrepresentation must be as to a material fact, or "one that is likely to induce the party to whom the representation is made to take action." *Bennitt*, 348 B.R. at 827. The plaintiff's reliance must have been reasonable under the circumstances; i.e., "[i]f the circumstances surrounding the pronouncement of the representation would have aroused suspicion as to its validity in the mind of a reasonable person, the plaintiff cannot be said to have reasonably relied upon the misrepresentation." *Id*. at 827 - 28.

Regardless of whether Smith asserts Wells Fargo knowingly, recklessly, or mistakenly made a false representation it must be established that Wells Fargo made a false representation in the first place. According to the Complaint Wells Fargo made false representations by completing the false mortgage documents, notarizing her forged signature, and filing the false documents with the probate court. At trial Smith testified that she never gave a mortgage to Wells Fargo (Norwest), that she never signed either the June or the August Mortgages that were introduced into evidence, and in fact, had never seen the Mortgage documents before. Both the June and August Mortgages are signed "Barbara G. Smith AKA Barbara C. Cray." Smith admitted that she has previously used the surname "Cray" but claimed she has never used the name "Barbara C. Cray."

At trial the only evidence offered to prove the Mortgages were forged was Smith's own testimony. Unfortunately, her testimony indicated her confusion as to all of the loan transactions themselves and thus her testimony is not credible. Regarding the 1997 loan or refinance with

---

[24] The standard for establishing fraud under Alabama law is not the same as establishing fraud for purposes of Section 523(a)(2)(A). *Bennitt*, 348 B.R. at 825.

15

Phoenix Financial that paid off the original loan from Collateral Investment, her testimony was conflicting and unclear as to the details. Further, her insistence that she did not give mortgages to Phoenix Financial or to Wells Fargo because these transactions were "consolidations" is confusing because the Title Certificate prepared by Newman Law Firm P.C. reflects that she did in fact give mortgages to each lender. Still further indication of her confusion was her testimony as to the Wells Fargo transactions. The June Note reflects that Smith borrowed approximately $53,000, and that as a cost of the loan Smith would repay $57,000 in addition to the $53,000 that she borrowed. Despite the clarity of the June Note, Smith was adamant in her testimony that she borrowed $57,000. Also, Smith's testimony as to what the Wells Fargo loan proceeds were used for is inconsistent and contradictory to other evidence admitted at trial. This is true particularly regarding whether she received funds from the June transaction. She claims she received nothing, but the June Note reflects that $6,973.29 was given to her directly. Finally, she was incorrect as to the maturity date of the loan. She believed it was 2010, yet the August Note reflects a loan term of 15 years from the origination of the loan, which would be 2013. Furthermore, Smith was completely confused and/or unable or unwilling to explain the vehicle purchases and payoffs resulting from the Wells Fargo transactions.

As a result of having restructured her home mortgage in order to consolidate bills, her mortgage payment went up to almost $800 per month. When her hours and wages at work were reduced she was unable to meet this financial obligation. This scenario is not new to this Court and is in fact what brings many to this Court's doorstep. What is different here, in this Court's view, is that Smith's allegations and testimony appear to be calculated to allow her to keep her home and not pay what appears to be a valid payoff amount. While this Court is extremely sympathetic to the

16

predicament Smith and countless others find themselves in, this Court's role is to consider and weigh the testimony and evidence presented. This Court cannot simply determine that because Smith has lived in the house since the early 1970s (40 plus years), and because she has made so many payments over these years, she can now own the house free and clear.[25] This Court concludes that Smith is either completely confused and mistaken about the transactions, and/or has convinced herself that Phoenix Financial and Wells Fargo loaned her large sums of money without taking mortgages to protect their interests. Unfortunately, either way, Smith has failed to prove what she alleges and maintains occurred in these transactions.

Considering the evidence presented this Court cannot conclude that Smith's purported signatures on the two mortgages are forged. The only evidence in favor of finding that the signatures were forged is Smith's testimony, which the Court finds to be not credible. It is difficult for the Court to accept that Smith knowingly gave a mortgage when she originally purchased the house but believed that she obtained the subsequent, larger loans from Phoenix Financial and Wells Fargo - which in turn paid off the prior mortgage indebtedness - without giving either Phoenix Financial or Wells Fargo a mortgage. Further, that portions of Smith's testimony are unquestionably at odds with

---

[25] This Court recognizes Smith now has a large arrearage on this mortgage debt that will mature in approximately 1 year. Smith probably cannot afford to pay the arrearage in a lump sum, but she may have alternatives to try to keep her home: 1) a refinancing that gives her longer than the 1 year remaining to pay the loan; 2) an agreement or arrangement with Wells Fargo allowing reasonable repayment terms; or 3) a new chapter 13 bankruptcy case that proposes to pay the entire loan balance including all reasonable and allowable charges plus a reasonable interest rate during the 60 month plan term of the new case. As an example, the following is an *approximate* calculation: $45,000 at 4.5% interest over 60 months would mean a principal and interest payment of approximately $850 per month. Note that these figures do *not* include any additional fees and costs incurred by Wells Fargo and the payment amount does *not* include any escrow amount for taxes and insurance (Smith would have to continue to pay these items on her own).

17

the other evidence before the Court, in particular the testimony of Russ Ogburn that as a Notary he would have signed the mortgage documents only if Smith signed in his presence and presented her identification, casts doubt on Smith's recollection and/or understanding of the loan transactions that occurred around fourteen years ago. Because there is no credible evidence before this Court that the signatures on the mortgages were forged, there is no evidence of false representations by Wells Fargo, and without false representations there can be no fraud. Thus, Smith is not entitled to a ruling in her favor on this count.

## **CONCLUSION**

There are two main contentions to Smith's Complaint, namely, that the balance she owes to Wells Fargo is far less than the amount stated on the proof of claim, and that her purported signatures on the June and August Mortgages are forgeries as she never gave Wells Fargo a mortgage on her home. Smith has made payments on the Wells Fargo loan for many years, and the Court understands her belief that the loan should have been paid off or at least have a significantly smaller balance than that listed on the proof of claim. It appears to the Court that perhaps Smith did not fully understand the loan transactions beginning with the Phoenix Financial loan and the Court is sympathetic that Smith may have gone so many years with a mistaken impression of the facts. However, absent any credible evidence to support her claims, this Court cannot determine either that the claim has been filed in the wrong amount or that her signatures on the June and August Mortgages have been forged. In contrast, Wells Fargo's position was supported by the testimony of Russ Ogburn, Notary on both the June and August Mortgages, who stated he would not have notarized the signatures on the Mortgages unless Smith had signed them in his presence. Russ Ogburn is no longer employed by Wells Fargo and has no interest in the outcome of this adversary proceeding. This Court finds that

18

his testimony as an objective witness is highly credible. Thus, Smith is not entitled to relief as to any counts in her Complaint, and further, the Objection to Claim is due to be overruled. Furthermore, based on Smith's failure to present any evidence as to her claims against defendants Dianne Marshall, T. Davidson, and Russ Osburn, such claims are due to be dismissed with prejudice. Pursuant to Rule 9021 of the Federal Rules of Bankruptcy Procedure, a separate Judgment consistent with this Memorandum Opinion and Order shall be entered.

Dated: September 12, 2012

/s/ Tamara O. Mitchell
TAMARA O. MITCHELL
United States Bankruptcy Judge

TOM/dgm
xc: Kenneth J. Lay, attorney for Debtor
David Sicay-Perrow, attorney for Wells Fargo Financial Alabama, Inc.
D. Sims Crawford, Chapter 13 Trustee